**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:17-cv-21097-UU

KATHLEEN MARSH,

   Plaintiff,

v.

CELEBRITY CRUISES, INC.,

   Defendant.

_____/

## ORDER ON *DAUBERT* MOTION

THIS CAUSE is before the Court upon Defendant's *Daubert* Motion to Strike or Exclude the Unreliable Opinion Testimony of Plaintiff's Expert Dr. Gerald York, M.D., Derived from Diffusion Tensor Imaging (the "Motion"). D.E. 57.

THE COURT has considered the Motion and the pertinent portions of the record[1], and is otherwise fully advised in the premises. For reasons set forth below, the Motion is DENIED.

## BACKGROUND

On or about March 23, 2017, Plaintiff filed her Complaint against Defendant, Celebrity Cruises, Inc. ("Celebrity"). D.E. 1. The Complaint alleged a singular claim for negligence based on Plaintiff's slip and fall on a puddle of water on the Solarium floor of the Celebrity cruise ship, Celebrity Solstice (the "Solstice"). Plaintiff alleges that Celebrity created a dangerous condition by failing to: (i) properly maintain the Solarium in the area where she slipped; and (ii) warn passengers of the danger. Plaintiff claims to have sustained physical injuries as a result of her accident, including a mild traumatic brain injury ("TBI").

---

[1]   In making its ruling, the Court did not in any way rely upon Dr. York's Affidavit (D.E. 67-1), which was attached as an exhibit to Plaintiff's Response to Celebrity's Motion (D.E. 67).

On May 24, 2017, the Court entered a Scheduling Order for Pretrial Conference and Trial. D.E. 16. In its Order, the Court required the parties to file all dispositive motions, including *Daubert* motions, no later than November 10, 2017. *Id.* On November 10, 2017, Celebrity filed the instant Motion.

## LEGAL STANDARD

Federal Rule of Evidence 702 states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Under Rule 702, the trial judge acts as a gatekeeper to ensure that expert evidence is both reliable and relevant. *Mike's Train House, Inc. v. Lionel*, L.L.C., 472 F.3d 398, 407 (6th Cir. 2006) (*citing Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

The Supreme Court set forth the criteria for the admissibility of scientific expert testimony under Rule 702 in *Daubert* by instructing trial judges to "determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue," which includes "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). In *Kumho Tire*, the Supreme Court subsequently held this standard to be applicable to all expert testimony, holding that "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping'

obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho*, 526 U.S. at 141.

In *Rink v. Cheminova, Inc.*, the U.S. Court of Appeals for the Eleventh Circuit established a three-part test to determine whether expert testimony should be admitted under *Daubert*, explaining that all of the following elements must be established prior to the presentation of expert testimony to the jury:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

400 F.3d 1286, 1291-92 (11th Cir. 2005). The party seeking to introduce expert testimony bears the burden of satisfying these criteria by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

The final requirement for admissibility of expert testimony is that it "assist the trier of fact." *Frazier*, 387 F.3d at 1244. In other words, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Id.* (citing *United States v. Reno*, 765 F.2d 983, 995 (11th Cir. 1985)). Expert testimony "is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys.*, 50 F.3d 908, 917 (11th Cir. 1995) (citations omitted).

## DISCUSSION

Plaintiff has designated Dr. Gerald York, M.D., a board-certified neuroradiologist and radiologist, as an expert witness. Dr. York is the Director of TBI Imaging ARA/IA and a Staff Neuroradiologist at the Providence Alaska Medical Center. D.E. 67-2, 84-1. Dr. York also works

as a Consultant to the Defense Veterans Brain Injury Center. D.E. 67-2, 84-1. Dr. York has extensive education, training, and experience in interpreting and analyzing MRI diagnostic scans for the purpose of clinical neuroradiology diagnosis of mild, moderate, and severe TBIs. D.E. 67 at *1. Dr. York has also participated in the development of approved protocols for neuroimaging of the brain and contributed to the American College of Radiology's Guidelines for Neuroimaging. *Id.*

Plaintiff retained Dr. York to provide his expert opinion on whether Plaintiff suffered a mild TBI as a result of her accident aboard the Solstice. After reviewing Plaintiff's diffusion tensor imaging ("DTI"), in conjunction with a multitude of other tests and records, Dr. York concluded that Plaintiff suffered a mild TBI as a result of her slip and fall. D.E. 57-1 at *11-12. In its Motion, Celebrity seeks to exclude Dr. York's testimony solely because of his reliance on DTI.  "DTI is a more sensitive, three-dimensional type of MRI that examines the microstructure of the white matter in the brain. DTI can show reduction in fractional anisotrophy ("FA") meaning that the white matter in the brain has been damaged." *Ruppel v. Kucanin*, 2011 WL 2470621, at *5 (N.D. Ind. June 20, 2011) (internal citations omitted). DTI is used because while "a traditional MRI shows the structure of the brain…the majority of people with mild brain injury will have a normal MRI even if they have significant impairment." *Id.*

   i.    *Parties' arguments*

In the instant Motion, Celebrity does not attack Dr. York's qualifications. Instead, Celebrity argues that Dr. York's opinions are unreliable and will not assist the trier of fact. Celebrity's arguments are based mainly on its claim that DTI is nothing more than "junk science" and that "Dr. York's DTI-based opinions that Plaintiff sustained a mild TBI amount to unsubstantiated speculation." D.E. 57 at *9. However, DTI findings and testimony have been

deemed reliable and admitted by courts across the country for almost a decade.[2] *E.g. Roach*, 2016 WL 9460306; *White v. Deere*, & Co., 2016 WL 462960, at *4 (D. Colo. Feb. 8, 2016); *Andrew v. Patterson Motor Frieght, Inc.*, 2014 WL 5449732, at *8 (W.D. La. Oct. 23, 2014) (citations omitted) ("In sum, the evidence submitted shows DTI has been tested and has a low error rate; DTI has been subject to peer review and publication; and DTI is a generally accepted method for detecting TBI."); *Ruppel v. Kucanin*, 2011 WL 2470621, at *6–12 (N.D. Ind. June 20, 2011) (finding DTI to be a reliable method); *Booth v. KIT, Inc.*, 2009 WL 4544743, at *3–4 (D.N.M. Mar. 23, 2009); *Hammar v. Sentinel Ins. Co., Ltd.,* No. 08–019984 at *2 (Fla.Cir.Ct.2010) (allowing DTI evidence to be admitted under the *Frye* standard); *Whilden v. Cline,* No. 08–cv–4210 (Col.Ct.Dist. May 10, 2010). Celebrity further asserts that Dr. York's opinions are inadmissible because DTI "'on its own' cannot serve as a valid and reliable diagnostic tool of mild TBI". D.E. 57 at *9. However, Dr. York's opinions are not exclusively based on his review of Plaintiff's DTI scans. Dr. York specifically stated in his deposition testimony that his opinions are based not only on his review of Plaintiff's DTI scans, but also of her volumetrics, FLAIR imaging, T2 imaging, susceptibility weighted images, and T1 anatomic imaging, as well Plaintiff's neurology and neuropsychology records. D.E. 57-1 at 11-12.

Celebrity also asserts that "[t]he DTI's acquisition of data is…affected by the field strength of the magnet", and that there is "a lack of a standardized protocol for the acquisition and interpretation of DTI results." D.E. 57 at *9. However, these issues do not make DTI technology "junk science" nor render Dr. York's opinions unreliable. Dr. York has "provided all the relevant information necessary for [Celebrity] to explore th[ese] topic[s] on cross examination." *Andrew*, 2014 WL 5449732, at *8. Furthermore, Plaintiff points out that Dr. York

---

[2]     It is worth noting that Celebrity failed to disclose the fact that DTI testimony has been previously admitted by a multitude of federal courts. In fact, Celebrity did not cite a single case in which DTI evidence was admitted at trial.

"is aware of the error potential and uses his best medical judgment in collating the objective abnormalities shown by the diagnostic procedures to clinical findings." D.E. 67 at *5. In doing so, Dr. York "arrived at medical conclusions regarding the meaning of the findings of [Plaintiff's] MRI scan, and the likely cause of those findings, all to a reasonable degree of medical probability". *Id.* at *8.

Finally, Celebrity argues that "permitting Dr. York to testify to the results of the DTI and the opinions he derived therefrom may confuse the jury as to the accuracy of any perceived connection between the DTI results and Plaintiff's alleged mild TBI". D.E. 57 at *10. However, Celebrity oversimplifies the basis of Dr. York's opinions by focusing solely on his review of Plaintiff's DTI scans. As explained *supra*, Dr. York's expert opinion is not derived exclusively from his review of Plaintiff's DTI scans, but also his review of a number of other imaging sequences and medical records. Moreover, Celebrity is unable to produce evidence to question the reliability of T1-Volumetric, T2-FLAIR, or SWI, which are among the other tests Dr. York relied upon in coming to his conclusions. D.E. 67 at *9. "The presence of abnormalities in the unchallenged MRI brain sequences establishes damage to [Plaintiff's] brain structures. The cause of the damage, again, is the subject of expert determination, of which neuroradiology is one of the disciplines." D.E. 57 at *10. As such, Dr. York's expert determination would certainly assist the jury in determining injury and causation in this case.

   *ii.*     *The Court's ruling*

   The Court will admit Dr. York's testimony as his opinions meet the Eleventh Circuit's three-part test for admission under *Daubert*. *See Rink*, 400 F.3d at 1291-92. Celebrity does not question the fact that Dr. York is qualified to testify regarding the matters he intends to address. Accordingly, the first *Rink* prong is met. As to the second *Rink* prong, the Court must determine

whether DTI is sufficiently reliable under *Daubert*. In making this assessment, a "pertinent consideration" is whether the technique has gained general acceptance. 509 U.S. at 594. "'DTI of the brain is a proven and well-established imaging modality in the evaluation and assessment of normal and abnormal conditions of the brain.'" *Roach v. Hughes*, 2016 WL 9460306, at * 3 (W.D. Ky. March 9, 2016) (*quoting Hammar v. Sentinel Ins. Co.,* No. 08-019984 (Fla. Cir. Ct. 2010) [DN 133-22] ¶ 3). DTI is regularly used as a diagnostic tool at the Detroit Medical Center, Cedars-Sinai, Brooke Army Medical Center, Duke University Medical Center, and at other locations throughout the country. *Ruppel v. Kucanin*, 2011 WL 2470621, at *7; D.E. 57-1 at *28; D.E. 67 at *16. Furthermore, the United States Army Telemedicine and Advanced Technology Research Command sponsored a Diffusion MRI TBI Roadmap Development Workshop "at which it was acknowledged that 'DTI has detected abnormalities associated with brain trauma'". *Ruppel*, 2011 WL 2470621, at *7 (internal citation omitted). Additionally, the United States Food and Drug Administration has approved the use of DTI technology. *Id.*; D.E. 57-1 at *28. *See also, Roach v. Hughes*, 2016 WL 9460306, at * 3 (W.D. Ky. March 9, 2016). The Court therefore concludes that DTI is a generally accepted method for analyzing and diagnosing TBIs.

Another key question under *Daubert*'s reliability inquiry is whether the technique at issue has been subjected to peer review and publication. 509 U.S. at 594. "As of early 2010, there were 3,472 papers on DTI published in peer review journals. Eighty-three of these articles involved DTI in relation to TBI." *Ruppel*, 2011 WL 2470621 at *8. Furthermore, in 2013, the "American Journal of Neuroradiology…published 'A Decade of DTI in Traumatic Brain Injury: 10 years and 100 Articles Later', comprehensively show[ing] that the use of DTI in the evaluation of TBI has been tested, validated, [and] peer reviewed." M.B. Hulkhower et al., A Decade of DTI in Traumatic Brain Injury: 10 Years and 100 Articles Later, 34 Am. J. Neuroradiology 2064,

2071 (2013) ("A unifying theme can be deduced from this large body of research: DTI is an extremely useful and robust tool for the detection of TBI-related brain abnormalities."); D.E. 67 at *17. Thus, there are extensive peer-reviewed articles on the effectiveness of DTI.[3]

Another consideration under *Daubert's* reliability analysis is whether a known error rate exists for the technique in question. 509 U.S. at 594. "DTI scan[s] and resulting FA quantification analysis can be tested and replicated and [] the error rate is not higher than other methods commonly relied upon such as MRIs." *Ruppel*, 2011 WL 2470621, at *9 (internal citation omitted). Furthermore, "Dr. York indicates that the DTI makes no error in obtaining data per the FDA approved protocol, he estimates a 1-2% error in interpreting the data in his own career...This testimony gives this [C]ourt a 98% certainty error free rate in Dr. York's analysis." D.E. 67 at *16 (internal quotations omitted). Taken together, it is the conclusion of the Court that the methodology by which Dr. York reaches his conclusions is sufficiently reliable.

As to the final *Rink* prong, the Court finds that Dr. York's testimony regarding the tests and records he reviewed in conjunction with Plaintiff's DTI scans, and the conclusions he derived therefrom, will assist the jury in determining whether Plaintiff sustained a mild TBI as a result of her accident aboard the Solstice.

## CONCLUSION

Celebrity's primary argument for exclusion of Dr. York's testimony is his reliance on DTI to reach his conclusions. As discussed above, DTI is a reliable method, especially when used in conjunction with the other medical tests and assessments relied upon by Dr. York. The

---

[3]        *See also,* Michael Lipton, *Diffusion–Tensor Imaging Implicates Prefrontal Axonal Injury in Executive Function Impairment Following Very Mild Traumatic brain Injury,* RADIOLOGY, Sept. 2009, Vol. 252: No. 3 ("Detection of ultrastructural damage by using DT imaging is a major advance in diagnostic imaging. Several studies have supported [its] capability...to help identify white matter abnormalities in patients with traumatic brain injury including mTBI."); Calvin Lo, *Diffusion Tensor Imaging Abnormalities in Patients with Mild Traumatic Brain Injury and Neurocognitive Impairment,* COMPUT ASSIST TOMOGR, March/April 2009, Vol. 33, No. 2 ("Our study shows that DTI can be used to detect differences between patients with cognitive impairment after mild TBI and controls.").

Court, therefore, finds that Dr. York's testimony meets the requirements for admissibility under Rule 702 and *Daubert*.

Accordingly, it is hereby

ORDERED AND ADJUDGED that the Motion, D.E. 57, is DENIED.

DONE AND ORDERED in Chambers, Miami, Florida, this _15th__day of December, 2017.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided: counsel of record